**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MATTHEW SISSEL, | |
| Plaintiff, | |
| v. | Civil Action No. 10-1263 (BAH) |
| | Judge Beryl A. Howell |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Pending before the Court is a facial constitutional challenge to 26 U.S.C. § 5000A, which is the requirement to maintain minimum essential insurance coverage contained in the Patient Protection and Affordable Care Act, as amended.  The plaintiff, Matthew Sissel, complains that this minimum coverage provision—commonly referred to as the "individual mandate"—is unconstitutional because Congress lacked the power to enact it under the Commerce Clause of the Constitution, and also because it was passed in violation of the Origination Clause of the Constitution.  The defendants, who are the primary government agencies and officials charged with overseeing the implementation of the individual mandate, have moved, under Federal Rule of Civil Procedure 12(b)(6), to dismiss the plaintiff's complaint for failure to state a claim on which relief may be granted.   In that motion, the defendants contend that the plaintiff's Commerce Clause arguments are foreclosed by the Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012).  The defendants also argue that the plaintiff's Origination Clause allegations fail to state a claim because the individual mandate is neither a "Bill[] for raising Revenue" subject to the Origination Clause,

1

nor a bill that originated outside the House of Representatives.  For the reasons discussed below, the Court grants the defendants' motion.

## I.   BACKGROUND

### A.   The Affordable Care Act's Minimum Coverage Provision

The Patient Protection and Affordable Care Act (the "Affordable Care Act") began as a bill introduced in the House of Representatives entitled the "Service Members Home Ownership Tax Act of 2009."  *See* H.R. 3590, 111th Cong. (2009).  That bill proposed certain amendments to the Internal Revenue Code, including provisions that extended tax benefits to members of the military, the Foreign Service, or the intelligence community who are called to extended duty service, as well as a provision that increased the estimated tax payments owed by corporations with at least $1 billion in assets.  *See id.* §§ 2–3, 6.  That bill passed the House of Representatives by a vote of 416 to zero.  *See* 155 Cong. Rec. H11126–27 (daily ed. Oct. 8, 2009).  Upon arrival in the Senate, the entire text and title of the bill were stricken except for its enacting clause, and in its place was inserted the text and title of the Affordable Care Act.  *See* 155 Cong. Rec. S11607 (daily ed. Nov. 19, 2009).[1]  That version of the bill passed the Senate on December 24, 2009 by a vote of sixty to thirty-nine, *see* 155 Cong. Rec. S13890–91 (daily ed. Dec. 24, 2009), and later passed the House on March 21, 2010, by a vote of 220 to 211, *see* 156 Cong. Rec. H1920–2169 (daily ed. Mar. 21, 2010).

On March 23, 2010, the Affordable Care Act was signed into law.  *See* Pub. L. No. 111-148, 124 Stat. 119.  One of the provisions in the Affordable Care Act is a requirement that every "applicable individual . . . ensure that the individual, and any dependent of the individual who is

---

[1] The individual mandate provision included in the amendment to H.R. 3590 was also contained in a separate bill that originated in and was passed by the House on November 7, 2009.  *See* H.R. 3962, 111th Cong. § 501 (2009); 155 Cong. Rec. H12623–H12968 (daily ed. Nov. 7, 2009).

an applicable individual, is covered under minimum essential coverage."[2]  *See id.* § 1501, 124 Stat. at 244 (codified at 26 U.S.C. § 5000A).   This same provision provides that, if any "applicable individual" fails to meet the requirement of maintaining "minimum essential" health insurance coverage, that individual is required to pay a "shared responsibility payment" to the federal government.[3]  Essentially, this minimum coverage provision—commonly referred to as the "individual mandate"—requires every "applicable individual" to maintain "minimum essential" health insurance coverage, or else make a "shared responsibility payment."   The individual mandate takes effect on January 1, 2014.  *See id.* (requiring "minimum essential coverage" for "each month beginning after 2013").

### B.   Factual and Procedural Background

The plaintiff in the instant case is an artist who lives in Cedar Rapids, Iowa.  *See* Am. Compl. ¶ 5, ECF No. 40.  He alleges in his Amended Complaint that he "is financially stable, has an annual income that requires him to file federal tax returns, and could afford health insurance if he wanted to obtain such coverage."  *Id.*  He claims that "[h]e is able to and does pay for any and all of his medical expenses out of pocket" and "does not have, need, or want health insurance."[4] *Id.*  Despite his alleged aversion to purchasing health insurance, however, the plaintiff also alleges that "[h]e is subject to the [Affordable Care] Act's provisions requiring either the purchase of federally prescribed health insurance or the payment of a tax."  *Id.*

---

[2] The term "applicable individual" is defined as any individual that does not qualify for one of four enumerated exceptions.  *See* 26 U.S.C. § 5000A(d).

[3] The amount of the shared responsibility payment "is calculated as a percentage of household income, subject to a floor based on a specified dollar amount and a ceiling based on the average annual premium the individual would have to pay for qualifying health insurance."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012) (citing 26 U.S.C. § 5000A(c)).

[4] The plaintiff is also employed part time as a Public Affairs Specialist for the National Guard, though it is unclear in which branch of the National Guard the plaintiff serves.  *See* Am. Comp. ¶ 5.  As a part of his service in the National Guard, the plaintiff was temporarily covered by government-provided health insurance while he participated in National Guard training from October 31, 2012 to February 11, 2013.  *See* Notice Regarding Plaintiff Matt Sissel at 2, ECF No. 42.  The plaintiff lost this health insurance coverage, however, when his training ended.  *See id.*

The plaintiff alleges that "he must act now to make financial plans to either buy insurance or make the [shared responsibility] payment." *Id.* ¶ 23. Specifically, the plaintiff claims that "[i]n anticipation of the costs he must incur to satisfy the [Affordable Care] Act's purchase requirement, he calculates that he will be unable to afford to continue his professional education," and he "has begun selling his artwork, and will continue to do so, rather than devote his attention full-time to his studies." *Id.* ¶ 26. Further, the plaintiff alleges that his "ability to attend national and international conferences and workshops relevant to his art profession has been curtailed because he is obliged to reduce expenditures in light of anticipated new health care costs, imposed by the [Affordable Care] Act." *Id.* ¶ 27.

On July 26, 2010, the plaintiff filed his original Complaint in this Court, which alleged that the Affordable Care Act's individual mandate provision was unconstitutional "because it exceeds Congress's authority under the Commerce Clause." *See* Compl. ¶ 1, ECF No. 1.[5] The defendants moved to dismiss the plaintiff's Complaint on November 15, 2010. On August 9, 2011, however, the Court stayed proceedings in this case pending the D.C. Circuit's decision in *Mead v. Holder*, No. 11-5047, which was a case challenging the individual mandate on the same grounds as the plaintiff in the instant case. *See* Minute Order dated Aug. 9, 2011. The D.C. Circuit issued its decision in that case on November 8, 2011. *See Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011).

On November 14, 2011, the Supreme Court granted a writ of certiorari in three other cases from the Eleventh Circuit that were, like *Seven-Sky* and the instant case, facial challenges to the individual mandate. *See* 132 S. Ct. 603–04 (2011) (mem.). In light of these events, the parties jointly requested that the Court stay these proceedings further, pending the Supreme Court's decision in those three consolidated cases. *See* Joint Mot. to Stay Proceedings, ECF No.

---

[5] This case was reassigned to the current presiding judge on June 3, 2011.

34.  The Court granted the parties' motion on December 1, 2011.  *See* Minute Order dated Dec.
1, 2011.  On June 28, 2012, the Supreme Court issued its decision in *National Federation of
Independent Business v. Sebelius* ("*NFIB*"), 132 S. Ct. 2566 (2012), the substance of which the
Court will discuss in more detail below.

On September 11, 2012, the plaintiff moved to amend his Complaint "based on the
Supreme Court's new legal framework for assessing the constitutionality of the purchase
requirement and the payment" required by the individual mandate.  *See* Pl.'s Mot. for Leave to
Amend Compl. at 2, ECF No. 37.  In particular, the plaintiff sought to make a "minor
amendment" to his Commerce Clause claim "reflecting the fact that, under the Supreme Court's
ruling, it is the legal obligation to buy insurance—not the payment—that is unconstitutional."
*See id.* at 1.  The plaintiff also sought to add a second claim asserting that the Affordable Care
Act's shared responsibility payment violates the Origination Clause of the Constitution.  *See id.*
The Court granted the plaintiff's motion to amend on October 11, 2012, and also denied without
prejudice, as moot, the defendants' previously filed motion to dismiss.  *See* Minute Order dated
Oct. 11, 2012.  The defendants then filed a motion to dismiss the plaintiff's Amended Complaint,
and in connection with that motion the Court granted leave to the Center for Constitutional
Jurisprudence to file an *amicus curiae* brief in support of the plaintiff's challenge.  *See* Minute
Order dated Dec. 4, 2012.  Currently pending before the Court is the defendants' Motion to
Dismiss Plaintiff's Amended Complaint, ECF No. 43, and, for the reasons discussed below, the
Court grants that motion.[6]

---

[6] The plaintiff has requested oral argument on the pending motion to dismiss. *See* Pl.'s Opp'n to Mot. to Dismiss
("Pl.'s Opp'n") at 3, ECF No. 45.  The Court concludes in its discretion, however, that the issues have been amply
briefed in both motions and that a hearing for oral argument is therefore unnecessary. *See* LCvR 7(f).  As a result,
the plaintiff's request for oral argument is denied.

## II.     LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* FED. R. CIV. P. 12(b)(6).   "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).   Instead, the complaint must plead facts that are more than "'merely consistent with' a defendant's liability."   *Id.* (quoting *Twombly*, 550 U.S. at 557).   Rather, "the plaintiff [must] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*; *accord Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).   The Court "must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged."   *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (citations and internal quotation marks omitted).

## III.    DISCUSSION

The Court will begin by discussing the plaintiff's Commerce Clause challenge before turning to the plaintiff's Origination Clause challenge.[7]

### A.      The Plaintiff's Commerce Clause Challenge Fails.

The merits of the plaintiff's Commerce Clause challenge have already been decided by the Supreme Court.   In *NFIB*, a majority of the Supreme Court reached two conclusions

---

[7] At the outset, the Court concludes that the plaintiff has standing to bring this lawsuit, since he alleges that he has suffered concrete financial injury as a direct result of his efforts to comply with the individual mandate. *See, e.g.*, Am. Compl. ¶¶ 26–27.   Clearly, invalidation of the individual mandate would remedy these allegedly ongoing financial injuries, since the plaintiff would no longer be "obliged to reduce expenditures in light of anticipated new health care costs, imposed by the [Affordable Care] Act." *See id.* ¶ 27.

regarding the constitutionality of the individual mandate that control the outcome of the instant case, both of which were announced by the opinion of Chief Justice Roberts. First, the Chief Justice and four dissenting Justices concluded that the individual mandate "cannot be sustained under" the Commerce Clause. *See NFIB*, 132 S. Ct. at 2591; *accord id.* at 2593 ("[T]he individual mandate cannot be sustained as a law regulating the substantial effects of the failure to purchase health insurance . . . . The commerce power thus does not authorize the mandate.").[8] Second, the Chief Justice held that "[o]ur precedent demonstrates that Congress had the power to impose the exaction in § 5000A under the taxing power, and that § 5000A need not be read to do more than impose a tax. That is sufficient to sustain it." *Id.* at 2598; *accord id.* at 2601 ("Section 5000A is . . . constitutional, because it can reasonably be read as a tax."). Thus, *NFIB* compels the conclusion that § 5000A is constitutional, regardless of whether it exceeded Congress's power under the Commerce Clause, because it is a constitutional exercise of the taxing power.

The plaintiff attempts to avoid this conclusion by contending that "the *NFIB* Court distinguished between a legal command to act or refrain from acting . . . and a tax on not having insurance." *See* Pl.'s Opp'n to Mot. to Dismiss ("Pl.'s Opp'n") at 3, ECF No. 45. Insisting that

---

[8] The *NFIB* decision contained four separate opinions. The opinion of Chief Justice Roberts announced the judgment and delivered the opinion of the Court with respect to Parts I (factual and procedural background), II (Anti-Injunction Act), and III-C (Taxing Clause). Justice Ginsburg, joined by three other Justices, wrote separately, concurring in part and dissenting in part but concurring in the judgment. Justices Scalia, Kennedy, Thomas, and Alito wrote a joint dissenting opinion, and Justice Thomas wrote a separate dissent to express his continuing disagreement with the "substantial effects" test under the Commerce Clause. Part III-A of the Chief Justice's opinion, in which he was joined by the four dissenting Justices, concluded that the individual mandate could not be sustained under the Commerce Clause. *See NFIB*, 132 S. Ct. at 2585–93. The Chief Justice argued in Part III-D of his opinion that his conclusion in Part III-A regarding the Commerce Clause was a holding of the case because "[w]ithout deciding the Commerce Clause question, I would find no basis to adopt . . . a saving construction [of the individual mandate under the Taxing Clause]." *Id.* at 2600–01. Justice Ginsburg, joined by three other Justices, disagreed with Part III-D of the Chief Justice's opinion, writing that there was "no reason to undertake a Commerce Clause analysis that is not outcome determinative." *Id.* at 2629 (Ginsburg, J., concurring in part and dissenting, in part). Although the plaintiff urges that "[t]his case is an appropriate vehicle for resolving the confusion over whether lower courts are bound by Chief Justice Roberts' statement" regarding the Commerce Clause, *see* Pl.'s Opp'n at 7, this Court takes no position on whether Part III-A of the Chief Justice's opinion was a holding or mere dictum because deciding that issue is not necessary to rule on the defendants' motion to dismiss.

this "distinction between the purchase requirement and the tax on not having insurance was critical to the *NFIB* decision," the plaintiff frames his first claim as a challenge only to the "purchase requirement" of the individual mandate, 26 U.S.C. § 5000A(a).  *See id.* at 4–5 (emphasis omitted).  In this vein, the plaintiff argues that "[w]hatever else the Supreme Court did in *NFIB* . . . it did not hold that the purchase requirement is a constitutional regulation of interstate commerce or a rule necessary and proper to carrying into effect a regulation of commerce."  *Id.* at 4.

The Court first observes the perplexing implications of the plaintiff's interpretation of the Supreme Court's *NIFB* decision.   On the one hand, the plaintiff insists that the unconstitutionality of the "purchase requirement" was "endorsed by four other Justices and therefore is a holding of the Court."  *See id.* at 4 (citation omitted).  In fact, the plaintiff goes out of his way to contend that "[w]hile the Court did refer throughout the opinion to 'section 5000A,' it is evident from the context that the mandatory aspect of that section—which purported 'to compel individuals not engaged in commerce to purchase an unwanted product'— was ruled unconstitutional."   *Id.* at 5 (citation omitted) (quoting *NFIB*, 132 S. Ct. at 2586 (opinion of Roberts, C.J.)).  Yet, on the other hand, the plaintiff prays this Court to declare the "purchase requirement" unconstitutional and immediately enjoin its enforcement because he "is currently injured by the purchase requirement."  *See* Am. Compl. ¶ 23; *id.* at 12–13.  This begs the question: How can the plaintiff be injured by a law that the Supreme Court has (supposedly) already declared to be unconstitutional?  Indeed, if the Supreme Court did what the plaintiff claims, there would appear to be no case or controversy for this Court to resolve.

The simple and unavoidable answer to this quandary is that the Supreme Court did *not* do what the plaintiff claims.  The Supreme Court did not, as the defendants put it, "subdivide

[§ 5000A] into a requirement to purchase insurance and a penalty on those who fail to do so." *See* Defs.' Mot. to Dismiss Pl.'s Am. Compl. ("Defs.' Mem.") at 1, ECF No. 43.  Rather, from the very beginning of his controlling opinion in *NFIB*, the Chief Justice referred to "the individual mandate" as a single provision of the Affordable Care Act, which he described as a provision that "requires individuals to purchase a health insurance policy providing a minimum level of coverage."  *See NFIB*, 132 S. Ct. at 2577.  Indeed, the Chief Justice consistently referred to "the individual mandate" at nearly every stage of his analysis.  *See, e.g.*, *id.* at 2580 ("The individual mandate requires most Americans to maintain 'minimum essential' health insurance coverage." (citing 26 U.S.C. § 5000A)); *id.* at 2591 ("The individual mandate . . . . cannot be sustained under a clause authorizing Congress to 'regulate Commerce.'"); *id.* at 2592 ("The individual mandate cannot be sustained under the Necessary and Proper Clause."); *id.* at 2599 ("Upholding the individual mandate under the Taxing Clause . . . does not recognize any new federal power.").

What is more, the Chief Justice could not have been clearer in Part III-B of his opinion that the individual mandate was susceptible to "more than one possible meaning" and that "it is therefore necessary to ask whether the Government's *alternative reading* of the statute—that it only imposes a tax on those without insurance—is a reasonable one."  *See id.* at 2593 (emphasis added); *see also id.* at 2594 ("The Government asks us to interpret the mandate as imposing a tax, if it would otherwise violate the Constitution.  Granting the [Affordable Care] Act the full measure of deference owed to federal statutes, it can be so read . . . .").  Hence, in *NFIB*, the Supreme Court did not subdivide the minimum coverage provision into a "purchase requirement" and a "tax on not having insurance" as the plaintiff contends.  *See* Pl.'s Opp'n at 5 (emphasis omitted).  Rather, in *NFIB*, the Supreme Court considered two alternative readings of

a *single* provision—26 U.S.C. § 5000A—and concluded that one reading violated the Commerce Clause, while the alternative reading passed muster under the Taxing Clause. *See, e.g.*, *NFIB*, 132 S. Ct. at 2600–01 (opinion of Roberts, C.J.) ("It is only because the Commerce Clause does not authorize [a command to buy insurance] that it is necessary to reach the taxing power question. And it is only because we have a duty to construe a statute to save it, if fairly possible, that § 5000A can be interpreted as a tax."). In fact, the Chief Justice specifically foreclosed the plaintiff's reading of his opinion by writing in no uncertain terms that "§ 5000A need not be read to do more than impose a tax . . . to sustain it." *Id.* at 2598. The plaintiff's insistence on reading § 5000A to "do more than impose a tax" is therefore a non-starter.[9]

The plaintiff's Commerce Clause claim is thus premised on a misreading of the Supreme Court's opinion in *NFIB*. The individual mandate, § 5000A, as interpreted by the Supreme Court—whose interpretation of federal statutes binds this Court—does not consist of a "purchase requirement" and a separate "tax on not having insurance," but rather is to be read as a single provision for purposes of constitutional analysis under either the Commerce Clause or the Taxing Clause. Since the plaintiff's reading of the statute was rejected by the Supreme Court in *NFIB*, the plaintiff's Commerce Clause claim, which relies on such a reading, must fail.

**B.     The Plaintiff Fails to State a Claim Under the Origination Clause.**

The first clause of Article I, section 7 of the Constitution states: "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." U.S. CONST. art. I, § 7, cl. 1. This clause is commonly known as the "Origination Clause." *See, e.g.*, *United States v. Munoz-Flores*, 495 U.S. 385, 387

---

[9] Further evidencing the fact that the Supreme Court rejected any subdivision of the individual mandate in its opinion, the Chief Justice never applied a severability analysis to § 5000A to determine whether the purportedly unconstitutional "purchase requirement" could be severed from the rest of the statute. *See, e.g.*, *NFIB*, 132 S. Ct. at 2607–08 (opinion of Roberts, C.J.) (performing severability analysis after finding Medicaid expansion provision unconstitutional).

(1990).   The plaintiff in this action claims that the individual mandate provision of the Affordable Care Act violates the Origination Clause because it is a "Bill[] for raising Revenue" that did not "originate in the House of Representatives."   *See* Am. Compl. ¶¶ 36–41.   To state a claim under the Origination Clause, the plaintiff must at least satisfy both elements of the constitutional text.   In other words, the statute in question must (1) be a "Bill[] for raising Revenue" that (2) did not "originate in the House of Representatives."   The plaintiff's allegations, however, do not satisfy either requirement.

### 1.        *The Individual Mandate Is Not a "Bill for raising Revenue."*

First, to be subject to the Origination Clause, a statute must be a "Bill[] for raising Revenue."   *See* U.S. CONST. art. I, § 7, cl. 1.   The plaintiff contends that the Origination Clause separates bills into two categories: (1) "those that raise revenue and are subject to the Origination Clause," and (2) "those that are 'bills for other purposes which may incidentally create revenue.'"   Pl.'s Opp'n at 14 (quoting *Twin City Nat'l Bank of New Brighton v. Nebecker*, 167 U.S. 196, 202 (1897)).   From this premise, the plaintiff argues categorically that "where a tax is imposed only as an exercise of the tax clause, and not as an adjunct to a regulation of commerce, or the exercise of some other enumerated power, then it is a tax for raising revenue subject to the Origination Clause."   *Id.* at 15.   To support this broad contention, the plaintiff cites six cases, five of which held that the statutes under review were not subject to the Origination Clause because they were not "Bills for raising Revenue."   *See id.* (citing *South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983), *Mulroy v. Block*, 569 F. Supp. 2d 256, 262 (N.D.N.Y. 1983), *Nebecker*, 167 U.S. at 202, *United States v. Norton*, 91 U.S. 566 (1875), *Millard v. Roberts*, 202

U.S. 429 (1906), and *Munoz-Flores*, 495 U.S. at 398).[10]   The plaintiff also quotes extensively from a seventy-year-old decision from the Sixth Circuit, which stated in pertinent part that "[t]axation is a congressional power specifically mentioned and described in the Constitution, but always in connection with the subject of the revenue for the support of the government generally." *See Rodgers v. United States*, 138 F.2d 992, 995 (6th Cir. 1943).

Although the plaintiff's argument may be superficially appealing, it cannot withstand even a cursory review of previous interpretations of the Origination Clause.   The Supreme Court has long held that "the practical construction of the constitution and the history of the origin of the [Origination Clause] prove that revenue bills are those that levy taxes, *in the strict sense of the word*, and are not bills *for other purposes* which may incidentally create revenue." *Nebecker*, 167 U.S. at 202 (emphasis added) (citing 1 Joseph Story, Commentaries on the Constitution of the United States § 880 (1833)).   Hence, when any revenues raised by a bill are "'incidental' to that provision's primary purpose," the bill is not one "for raising Revenue" within the meaning of the Origination Clause.   *See Munoz-Flores*, 495 U.S. at 399; *accord Nebecker*, 167 U.S. at 203 (concluding that provision under review was not revenue-raising where its "main purpose" was "to provide a national currency"); *see also United States v. King*, 891 F.2d 780, 781 (10th Cir. 1989) ("Where the main purpose of the act is other than raising revenue, it is not subject to challenge under the origination clause."); *United States v. Herrada*, 887 F.2d 524, 528 (5th Cir. 1989) (holding that Supreme Court precedents "instruct us to consider the overarching purpose of an Act when one of its provisions is subject to an Origination Clause challenge").   The text of the Clause itself confirms this purposive approach.   *See* U.S. CONST. art. I, § 7, cl. 1 (applying

---

[10] *South Carolina ex rel. Tindal v. Block* did not reach the Origination Clause question, holding instead that the exaction under review was "a fee rather than a tax," and therefore "not an unconstitutional exercise of the taxing power." *See* 717 F.2d at 887.

only to "Bills *for* raising Revenue."(emphasis added)).   A purposive analysis is therefore necessary to discern whether a provision is "for raising Revenue."

Following this purposive approach, the Supreme Court has held that "a statute that creates a particular governmental program and that raises revenue to support that program, as opposed to a statute that raises revenue to support Government generally, is not a 'Bill for raising Revenue' within the meaning of the Origination Clause." *Munoz-Flores*, 495 U.S. at 398. Hence, when revenues raised by a provision support a "particular governmental program," *id.*, it is clear that the primary purpose of that provision is not "to raise revenue to be applied in meeting the expenses or obligations of the government," *see Nebecker*, 167 U.S. at 203.   The earmarking of revenues for a particular government program, however, is but one way for a court to discern that the revenues raised by a provision are merely "'incidental' to that provision's primary purpose." *See Munoz-Flores*, 495 U.S. at 399.   The court may also analyze more generally whether the provision in question "was a means for effectually accomplishing" an end other than "meeting the expenses or obligations of the government." *See Nebecker*, 167 U.S. at 203.   Under the Supreme Court's precedents—sparse as they may be on this subject[11]—so long as the primary purpose of the provision is something other than raising revenue, the provision is not subject to the Origination Clause.

There is no dispute that the individual mandate will raises revenues through the "shared responsibility payments" required under § 5000A.   There is also no dispute that those revenues are "paid into the Treasury by taxpayers when they file their tax returns." *See NFIB*, 132 S. Ct. at 2594 (internal quotation marks omitted) (citing 26 U.S.C. § 5000A(b)).   Just because the

---

[11] The Court has only located six reported decisions of the Supreme Court that reached the merits of an Origination Clause challenge. *See Munoz-Flores*, 495 U.S. 385; *Rainey v. United States*, 232 U.S. 310 (1914); *Flint v. Stone Tracy Co.*, 220 U.S. 107 (1911); *Millard*, 202 U.S. 429; *Nebecker*, 167 U.S. 196; *Norton*, 91 U.S. 566.  The Supreme Court has never invalidated an act of Congress under the Origination Clause.

revenues collected from the individual mandate do not support a "particular governmental program," however, does not mean that those revenues are raised for the purpose of "support[ing] Government generally." *See Munoz-Flores*, 495 U.S. at 398. Both the Supreme Court and the D.C. Circuit have concluded that the individual mandate (and its associated shared responsibility payment) are "plainly designed to expand health insurance coverage" even though they "will raise considerable revenue." *See NFIB*, 132 S. Ct. at 2596; *accord Seven-Sky*, 661 F.3d at 6 (observing that "congressional findings never suggested that Congress's purpose was to raise revenue," but rather "congressional findings emphasize that the aim of the shared responsibility payment is to encourage everyone to purchase insurance; the goal is universal coverage, not revenues from penalties").[12] It is unavoidable, in light of this clear congressional purpose, that any revenue created by the individual mandate is merely incidental. Every shared responsibility payment, though it may grow the government coffers, symbolizes the government's failure to attain its stated "goal [of] universal coverage." *See Seven-Sky*, 661 F.3d at 6. In other words, Congress's preference would be for the individual mandate to raise zero revenues, and thus the provision cannot fairly be characterized as a "Bill[] *for* raising Revenue."

---

[12] Although the Supreme Court has cautioned that "[i]nquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts," *see Sonzinsky v. United States*, 300 U.S. 506, 513–14 (1937), that admonition was applied when examining whether a particular exaction was passed pursuant to Congress's taxing power, not when determining whether the exaction is subject to the Origination Clause. The Origination Clause, unlike the Taxing Clause, contains a clear textual cue that the Framers intended the purpose of the legislation in question, rather than only its effects, to be considered in determining whether the Clause is applicable. *Compare* U.S. CONST. art. I, § 7, cl. 1 (applying only to "Bills *for* raising Revenue."(emphasis added)), *with* U.S. CONST. art. I, § 8, cl. 1 (granting Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States"). Thus, although the Supreme Court has suggested that it has "abandoned" any "distinctions between regulatory and revenue-raising taxes" when analyzing Congress's taxing power or the applicability of the Anti-Injunction Act, *see Bob Jones Univ. v. Simon*, 416 U.S. 725, 741 n.12 (1974), that distinction still retains force with respect to the Origination Clause. Indeed, Chief Justice Roberts can be read to have revived this distinction to some degree in *NFIB* by citing with approval a line of cases that distinguished between taxes and "punitive exactions obviously designed to regulate behavior otherwise regarded at the time as beyond federal authority." *See NFIB*, 132 S. Ct. at 2599 (citing *United States v. Butler*, 297 U.S. 1 (1936) and *Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922)).

*See* Def.'s Mem. at 10 ("[B]y encouraging the purchase of health insurance, the provision will operate most successfully by generating even less revenue.").

From the perspective of the Origination Clause, the instant case is analogous to the Supreme Court's decision in *Nebecker*.  There, like here, "[t]he tax [was] a means for effectually accomplishing [a] great object" of government.  *See Nebecker*, 167 U.S. at 203.  In *Nebecker*, that "great object" was "to provide a national currency," *id.*, while in the instant case that object is "to expand health insurance coverage," *NFIB*, 132 S. Ct. at 2596.  Here, as in *Nebecker*, any revenue raised by the tax will be merely "'incidental' to that provision's primary purpose."  *See Munoz-Flores*, 495 U.S. at 399.  Hence, under the Supreme Court's precedents, the individual mandate challenged in this case is not a "Bill[] for raising Revenue" within the meaning of the Origination Clause and therefore it need not have "originate[d] in the House of Representatives."

### 2.     *The Individual Mandate Was an Amendment to a Bill That Originated in the House of Representatives.*

Even if the individual mandate could arguably be interpreted as a "Bill[] for raising Revenue," the plaintiff's Origination Clause would still fail as a matter of law because the bill that later became the Affordable Care Act originated in the House of Representatives.  The plaintiff alleges that the Affordable Care Act "originated in the Senate, not the House."  Am. Compl. ¶ 40.  Although the plaintiff appears to concede that H.R. 3590—the bill that was later enacted as the Affordable Care Act—was first passed by the House in September 2009, *see id.*, the plaintiff nevertheless contends that the *particular provision* at issue, § 5000A "originated in the Senate when the Senate struck the entire text of H.R. 3590, a House-passed bill that was not for raising revenue, and replaced it entirely with the text that ultimately became the PPACA," Pl.'s Opp'n at 9 (emphasis omitted).  The plaintiff argues that this so-called "gut-and-amend" procedure "is not 'origination' as the Origination Clause contemplates."  *Id.*  According to the

plaintiff, "[a] bill *originates* in the House when it is *initiated* there—*i.e.*, when its substance is submitted for deliberation and enactment in the House in the first instance." *Id.* (emphasis in original) (citing *Hubbard v. Lowe*, 226 F. 135, 137–38 (S.D.N.Y. 1915)).[13]

The defendants contend that the plaintiff "misunderstands the requirements of the Origination Clause" because that Clause "does not require that each individual provision of a 'Bill for raising Revenue' originate in the House, but rather that the 'Bill' originate in the House." Defs.' Reply Mem. in Supp. Mot. to Dismiss Pl.'s Am. Compl. ("Defs.' Reply") at 7–8 ECF No. 49.   Contrary to the plaintiff's view, the defendants argue, "[t]he Clause does not preclude the Senate from inserting new provisions, or even from substituting out the entire text of the House bill." *Id.* at 8.   The defendants characterize "gut-and-amend" as a "commonplace procedure," and thus the defendants warn that the plaintiff's "test for compliance [with the Origination Clause] would lead courts to set aside Congressional enactments as a matter of routine." *Id.* at 7–8.   The defendants further contend that "the Court's role here is limited to ensuring that the bill originated in the House . . . and does not entail a comparison of the subject matter of the two bills." *Id.* at 11.   Finally, the defendants emphasize that, even assuming that (1) the Affordable Care Act were considered a "Bill[] for raising Revenue," and (2) comparison of the subject-matters of the two versions of the bill were warranted, the statute still passes muster under the Origination Clause because H.R. 3590's original text "concerned the

---

[13] The plaintiff's reliance on *Hubbard* on the origination question is puzzling.  In that case, the court acknowledged that a "bill" is "a draft of a proposed statute submitted to the Legislature for enactment," and thus "what the Constitution requires to originate in the House of Representatives is not the final product of the legislative will, not the statute, but a project for a statute, which *may b*[*y*] *amendment take a very different shape by the time it is ready for promulgation as a law.*" *Hubbard*, 226 F. at 138 (emphasis added).  Indeed, *Hubbard* involved the converse of the situation presented in this case: the Senate had proposed a bill, "but the House struck out everything after the enacting clause and substituted the act as subsequently concurred in by the Senate." *Id.*  The court not only held that the bill had originated in the Senate, but it specifically upheld this gut-and-amend practice, commenting (nearly 100 years ago) that "[a]mendments by substitution are a well known method of expediting legislation," and even complete substitution of the text of a bill "was legitimate amendment" because "though an amendment may be the most important part of an act, it remains formally only an addition or subtraction; it has no independent parliamentary vitality." *Id.* at 139–40.  Thus, for the plaintiff to cite *Hubbard* for the notion that "gut and amend" is not true "origination" is completely at odds with that case's substance.

Government's collection of revenue," and thus the amendments to H.R. 3590 in the Senate were "germane" to the subject-matter of the House bill.  *Id.* at 9–11.

At the outset, the Court observes that the defendants are correct that the text of the Origination Clause clearly only requires a "Bill[] for raising Revenue" to originate in the House, rather than requiring that particular provisions originate there.   Holding otherwise would substantially limit the Senate's explicit power to "propose or concur with Amendments" to revenue bills.  *See* U.S. CONST. art. I, § 7, cl. 1; *see also* Rebecca M. Kysar, *The 'Shell Bill' Game: Avoidance and the Origination Clause*, 91 WASH. U. L. REV. (forthcoming 2014) (citing historical argument that a germaneness requirement "would deny to the Senate the power to make anything more than mere formal amendments" (internal quotation marks omitted)). Indeed, by focusing on the first half of the Origination Clause, the plaintiff misses the question at the heart of the origination question in this case, which is whether, under the *second* half of the Origination Clause, the Senate exceeded its power to "propose or concur with Amendments as on other Bills" when it struck out the entire text of the House-passed H.R. 3590 and replaced it with the Affordable Care Act.

The Supreme Court has only addressed the origination question—*i.e.*, whether a bill "originated in the House of Representatives"—in two published decisions.   First, in *Flint v. Stone Tracy Co.*, the Court addressed an Origination Clause challenge to a law that began in the House with an inheritance tax, but was later amended in the Senate by striking the inheritance tax and substituting a corporation tax.  *See* 220 U.S. 107, 143 (1911), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).   In that case, the Court did not discuss the origination question at length, simply concluding that the Court "perceive[d] no reason in the [Origination Clause] why [the statute] may not be amended in the

17

Senate in the manner which it was in this case" because "[t]he amendment was germane to the subject-matter of the bill, and not beyond the power of the Senate to propose." *Id.*[14]  Only three years after *Flint*, the Court again addressed an Origination Clause challenge and discussed the origination question.  *See Rainey v. United States*, 232 U.S. 310 (1914).  There, the Court refused to "intimat[e]" that courts had the power "after an act of Congress has been duly promulgated, to inquire in which House it originated, for the purpose of determining its validity." *Id.* at 317.  The Court proceeded to "adopt and approve" the reasoning of the lower court, which was that a bill sufficiently complies with the Origination Clause if the law in question "was proposed by the Senate as an amendment to a bill for raising revenue which originated in the House." *Id.* Notably, the Court also stated that "it is not for this court to determine whether the amendment was or was not outside the purposes of the original bill." *Id.*

The Court recounts at the outset that it has already decided that the Affordable Care Act was not a "Bill[] for raising Revenue" that needed to originate in the House of Representatives. *See supra* Part III.B.1.  Thus, in addressing the origination question, the Court assumes, for the purpose of argument only, that the Affordable Care Act was a "Bill[] for raising Revenue."  With the analysis thus framed, the Court begins by considering whether the Supreme Court's precedents impose a "germaneness" requirement on the Senate's Origination Clause amendment power.  Certainly, in *Flint*, the Court made clear that if a Senate amendment is "germane to the subject-matter of the bill, and not beyond the power of the Senate to propose," the resulting piece of legislation comports with the Origination Clause.  *See Flint*, 220 U.S. at 143.  The plaintiff reads this as a requirement under the Origination Clause that "Senate amendments . . . be

---

[14] The Court was also careful to point out that it did "not wish to be regarded as holding that journals of the House and Senate may be examined to invalidate an act which has been passed and signed by the presiding officers of the House and Senate, and approved by the President, and duly deposited with the State Department." *Flint*, 220 U.S. at 143 (citing *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892)).

'germane' to the subject of the original House bill." Pl.'s Opp'n at 11. The Supreme Court did not couch this as a requirement in *Flint*, however. Rather, the Supreme Court concluded that it is *sufficient* to comport with the Origination Clause when a Senate amendment to a House revenue bill is "germane to the subject-matter of the bill" and is not otherwise "beyond the power of the Senate to propose." *See Flint*, 220 U.S. at 143.

Even if germaneness were a limit on the Senate's Origination Clause amendment power, the Supreme Court's statement that "it is not for this court to determine whether the amendment was or was not outside the purposes of the original bill," *Rainey*, 232 U.S. at 317, strongly suggests that it is for Congress, not the courts, to decide whether an amendment is properly germane in any given case.[15] It is true that the Supreme Court has held that Origination Clause claims are not categorically beyond the jurisdiction of Article III courts. *See Munoz-Flores*, 495 U.S. at 396; *accord id.* at 397 ("A law passed in violation of the Origination Clause would . . . be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would be a law passed in violation of the First Amendment."). Notably, however, in *Munoz-Flores* the Supreme Court had no occasion to adjudicate the origination question because the Court had already held that the law in question was not a revenue-raising bill. *See id.* at 401. Thus, *Munoz-Flores* did not hold that questions about the germaneness of Senate amendments to revenue bills are justiciable.

This conclusion is supported further by the Supreme Court's discussion in *Munoz-Flores* that distinguished the Supreme Court's much earlier decision in *Marshall Field*. That brief discussion was laid out in what the D.C. Circuit has called "an oblique footnote." *See Pub.*

---

[15] Indeed, the House of Representatives has a longstanding procedure for enforcing the Origination Clause, commonly referred to as "blue-slipping." *See, e.g.*, Rebecca M. Kysar, *On the Constitutionality of Tax Treaties*, 38 Yale J. Int'l L. 1, 12 (2013). By that process, the House passes a resolution which returns to the Senate any bill that the House considers to be revenue-raising. *See id.*; *see also* Rules of the House of Representatives, 113th Cong., Rule XVIII, cl. 3 (2013).

*Citizen v. U.S. Dist. Court for D.C.*, 486 F.3d 1342, 1352 (D.C. Cir. 2007).  That footnote, whose final two sentences "defy easy comprehension," *id.* at 1354, appeared to say that the Origination Clause, unlike the Journal Clause addressed in *Marshall Field*, contained a "constitutional requirement binding Congress."  *See Munoz-Flores*, 495 U.S. at 391 n.4.[16]  Whatever this footnote means, the Supreme Court in *Munoz-Flores* did not purport to address the justiciability of inquiring into the "germaneness" of a Senate amendment to a House revenue bill, and there is certainly no textual "constitutional requirement binding Congress" to make only germane amendments to revenue bills.  *See id.*  Thus, the line drawn in *Munoz-Flores* between justiciable and non-justiciable inquiries under the Origination Clause clearly allows review of whether a provision is a "Bill[] for raising Revenue," but likely stops short of permitting scrutiny of whether a Senate amendment to a revenue bill is germane.

The fact that the Senate's power to amend revenue bills is not cabined by a justiciable germaneness requirement is further confirmed by the text of the Origination Clause itself.  The second half of the Origination Clause makes clear that the Senate's power to amend revenue bills is "as on other Bills."  *See* U.S. CONST. art. I, § 7, cl. 1.  This language indicates that the Senate's power to amend revenue bills is no different than its ability to amend non-revenue bills.  That more general power to amend legislation, however, likely falls within Congress's exclusive power to "determine the Rules of its Proceedings," U.S. CONST. art. I, § 5, cl. 2, and thus compliance with the more general amendment power is arguably a non-justiciable political

---

[16] The Court in *Munoz-Flores* also stated in a separate footnote that the Supreme Court had "reserved the question whether 'there is judicial power after an act of Congress has been duly promulgated to inquire in which House it originated.'"  *See Munoz-Flores*, 495 U.S. at 389 n.2 (quoting *Rainey*, 232 U.S. at 310).  The *Munoz-Flores* Court, however, did not mention the portion of *Rainey* which stated that "it is not for this court to determine whether the amendment was or was not outside the purposes of the original bill."  *See Rainey*, 232 U.S. at 317.

question.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962).[17]  Indeed, the second clause of Article I,

section 5 is a "textually demonstrable constitutional commitment of [an] issue to a coordinate

political department" if ever there was one, and having courts scrutinize parliamentary procedure

relating to the required relevance of a legislative amendment would "express[] lack of the respect

due coordinate branches of government."  *See id.*

Even assuming that the Origination Clause contains a germaneness requirement, and

assuming that the question of compliance with such a requirement is justiciable, *Flint* established

a very loose conception of germaneness in any event.  As discussed above, the bill reviewed in

*Flint* originally included an inheritance tax, and it was later amended to remove the inheritance

tax and to insert in its place a corporate income tax.  *See Flint*, 220 U.S. at 143–44.  Although a

corporate income tax is germane to an inheritance tax insofar as they are both taxes, the

similarities end there.  Hence, if the Supreme Court imposed a germaneness requirement in *Flint*,

the most that it would require would be that both the original House bill and the Senate

amendment be revenue-raising in nature.[18]  The same requirement was applied in *Rainey*, where

the Supreme Court found it sufficient that the provision in question "was proposed by the Senate

as an amendment to a bill for raising revenue which originated in the House."  *See Rainey*, 232

U.S. at 317.[19]  That requirement is met here.  As the defendants point out (and the plaintiff

---

[17] Both Houses of Congress have promulgated rules governing the germaneness of amendments.  *See* Rules of the House of Representatives, 113th Cong., Rule XVI, cl. 7 (2013); Standing Rules of the Senate, 112th Cong., 1st Sess., Rule XVI, ¶ 4 (2008) (germaneness requirement for amendments to appropriations bills); *see also id.* Rule XXII, ¶ 2 (germaneness requirement when Senate operating under cloture).

[18] The word "germane" is usually defined as "[r]elevant" or "pertinent."  *See* BLACK'S LAW DICTIONARY 756 (9th ed. 2009); 6 OXFORD ENGLISH DICTIONARY 468 (2d ed. 1989).

[19] This broad conception of a germaneness requirement is also in keeping with current congressional practice with respect to revenue bills.  *See* Kysar, *On the Constitutionality of Tax Treaties*, 38 Yale J. Int'l L. at 13 ("Current precedent . . . recognizes that the Senate generally has the power to amend a House-originated revenue bill without regard to germaneness, but that it may not propose a revenue-related amendment to a non-revenue bill.").

chooses not to discuss), "every provision of H.R. 3590 [as it originated in the House] concerned the Government's collection of revenue."  Defs.' Reply at 9.

On this point, the plaintiff asserts, without citation, that "it is undisputed that H.R. 3590 was not originally a bill for raising revenue," *see* Pl.'s Opp'n at 10 (emphasis omitted), but this statement is both incorrect and self-defeating.  It is incorrect because the defendants *do* contend that "if the ACA is a 'Bill for Raising Revenue,' then so is the House [version of H.R. 3590]." Defs.' Reply at 9.  The plaintiff's statement is also self-defeating because it entirely undercuts the plaintiff's position that the individual mandate is a "Bill[] for raising Revenue."  How can it be that a law which, *inter alia*, collects a tax on failing to buy health insurance is a "Bill[] for raising Revenue," but a law which, *inter alia*, raises income taxes on large corporations, as the original House version of H.R. 3590 proposed, is not?  Although the plaintiff's position cries out for resolution of this tension, the plaintiff provides none.  Indeed, the plaintiff repeatedly asserts, without explanation, that the House version of H.R. 3590 was "not for raising revenue," *see, e.g.*, Pl.'s Opp'n at 9,[20] but such a conclusory assertion does not advance the plaintiff's argument, particularly when it is in such palpable tension with one of his other primary contentions.

The Court concludes for the foregoing reasons that, even assuming the individual mandate was a "Bill[] for raising Revenue," that bill "originate[d] in the House of Representatives" as H.R. 3590 and was later duly amended by the Senate in a manner consistent with the Origination Clause.

## IV.   CONCLUSION

In sum, the Court first holds that the plaintiff's Commerce Clause challenge to the Affordable Care Act's individual mandate is foreclosed as a matter of law by the Supreme

---

[20] *See also* Pl.'s Opp'n at 10 (asserting House bill "was not a bill for raising revenue"); *id.* ("H.R. 3590 was *not* originally a bill for raising revenue."); *id.* at 12 (asserting that "H.R. 3590 was not a bill for raising revenue when it originated in the House"); *id.* at 14 (contending that H.R. 3590 was "a House-passed bill that did not raise revenue").

Court's decision in *NFIB*, and thus the plaintiff fails to state a claim under the Commerce Clause. The Court further holds that the individual mandate was not a "Bill[] for raising Revenue," and thus the plaintiff's Origination Clause challenge likewise fails to state a claim upon which relief may be granted.   In any event, even if the individual mandate were a "Bill[] for raising Revenue," the Court holds that it was nevertheless an amendment to a bill that "originated in the House of Representatives" and thus was enacted in compliance with the Origination Clause.

An appropriate Order accompanies this Memorandum Opinion.

Date: June 28, 2013

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge